# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

## EXCLUSIVE CAPITAL PARTNERS LLC v CITY OF ROYAL OAK

Docket Nos. 168243 and 168244. Argued on application for leave to appeal March 12, 2026. Decided July 23, 2026.

At issue in these consolidated appeals is whether the marijuana retail licensing process of the city of Royal Oak complied with the Open Meetings Act (OMA), MCL 15.261 *et seq*. The city's ordinance regulating recreational marijuana establishments grants the city manager the power to implement and administer the license application process. Applicants are reviewed in a competitive process under which the city manager "or his or her designee" ranks the applicants according to criteria set forth in the ordinance. Plaintiffs, Quality Roots, Inc., and Exclusive Capital Partners LLC, were among 21 applicants for two available licenses, and the city manager convened a workgroup to review the applications. The city manager ultimately selected two applicants other than plaintiffs. Quality Roots filed a complaint against the city in the Oakland Circuit Court, challenging the city's issuance of the licenses and alleging, among other things, violations of the Michigan Regulation and Taxation of Marihuana Act (MRTMA), MCL 333.27951 *et seq*., and the OMA. Exclusive Capital Partners subsequently filed a complaint against the city in the Oakland Circuit Court making similar claims. The city moved for summary disposition of both complaints under MCR 2.116(C)(8) and (C)(10), and the trial court, Rae Lee Chabot, J., granted the city's motions.

Both plaintiffs appealed, and the Court of Appeals, BOONSTRA, P.J., and JANSEN and N. P. HOOD, JJ., affirmed the trial court's orders granting summary disposition with respect to plaintiffs' MRTMA claims, but reversed with respect to plaintiffs' OMA claims and remanded to the trial court to determine the appropriate remedy for the OMA violation. ___ Mich App ___ (December 4, 2024) (Docket Nos. 366247 and 366257). The panel concluded that the city manager met the definition of a "governing body" under the OMA and was therefore subject to the requirements of the OMA; accordingly, the meetings between the city manager and the workgroup appointed by the city manager should have been held publicly. Quality Roots and the city both applied for leave to appeal in the Supreme Court. The Supreme Court denied Quality Roots's application but ordered oral argument on the city's applications, directing the parties to address whether the city manager was a "public body" as defined by MCL 15.262(a). ___ Mich ___; 26 NW3d 427 (2025).

In a unanimous opinion by Justice ZAHRA, the Supreme Court, in lieu of granting leave to appeal, *held*:

The city manager was not required to comply with the OMA in conducting the marijuana retail license selection process. The city manager was acting in accordance with ordinance-based authority when ranking marijuana retail license applicants to receive license slots, and the marijuana ordinance does not itself qualify as a delegation of authority subject to the OMA. Accordingly, Part VI of the judgment of the Court of Appeals is reversed.

The city manager does not qualify as a "public body" as defined by the OMA. A governmental entity can qualify as a public body under the OMA by one of two pathways: (1) by satisfying the statutory definition of "public body" in its own right, or (2) by being delegated authority from another public body. The city manager here does not qualify as a public body under the first pathway. As this Court held in *Herald Co v Bay City*, 463 Mich 111 (2000), "public body" as used in the OMA connotes a collective entity and does not encompass individuals. The city manager also does not qualify as a public body under the second pathway. In concluding otherwise, the Court of Appeals presumed that the city commission held original authority under the ordinance to decide among license applicants, but that the city manager was the de facto decision-maker in determining which applicants received licenses. However, the ordinance gives the city manager the power to decide among applicants, and the city commission has no role under the ordinance in ranking applicants. The Court of Appeals erred by concluding that the city commission delegated its authority under the marijuana ordinance to the city manager, thereby rendering him a "public body"; instead, the city manager was acting alone in his official work capacity pursuant to an independent grant of authority and, therefore, was not subject to the OMA.

Plaintiffs' alternative argument that the ordinance itself constitutes a delegation of the city commission's general licensing authority given to it in the city charter conflicts with this Court's prior holdings in this context. The OMA contemplates that some entities empowered by ordinance will be subject to the OMA. However, the text of the OMA does not support plaintiffs' broad argument that *every* ordinance-based delegation of authority, to any entity, by a charter-empowered legislative public body with generalized authority automatically constitutes a delegation of authority subject to the OMA. The OMA accommodates at least some entities empowered by ordinance that do not meet the definition of "public body" subject to the OMA. Moreover, most municipal governments are empowered by charter, and the vast majority of ordinances are enacted by such municipalities. Under plaintiffs' interpretation, every ordinance-based grant of authority would import the requirements of the OMA; the OMA should not be interpreted so broadly. While a delegation by ordinance might in some circumstances qualify as an OMA-subject delegation under the second pathway, according to *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211 (1993), courts must analyze an empowering ordinance in the context of the OMA by asking whether the primary government entity has delegated any functions that it is required by law to do, whether the primary government entity's actions have the primary purpose of permitting that entity to evade the requirements of the OMA, and whether the public body has provided authority to a subquorum of its own members; further, under *Pinebrook Warren, LLC v City of Warren*, 515 Mich 438 (2024), when applying the pathways to OMA obligations, a court must consider how the relevant public body functions and must not confine its analysis to the public body's enabling provisions.

Part VI of the Court of Appeals judgment reversed; case remanded to the trial court for entry of summary disposition in favor of the city.

Justice HOOD did not participate because he was on the Court of Appeals panel that issued the decision under review.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 23, 2026

STATE OF MICHIGAN

SUPREME COURT

EXCLUSIVE CAPITAL PARTNERS LLC,

   Plaintiff-Appellee,

v               No. 168243

CITY OF ROYAL OAK,

    Defendant-Appellant.

---

QUALITY ROOTS, INC.,

   Plaintiff-Appellee,

v               No. 168244

CITY OF ROYAL OAK,

    Defendant-Appellant,

and

PGSH HOLDINGS LLC,

         Intervening Defendant.

_____

BEFORE THE ENTIRE BENCH (except HOOD, J.)

ZAHRA, J.

This case involves the application of the Open Meetings Act (OMA)[1] to the marijuana retail licensing process of the City of Royal Oak (the City). After conducting a selection process for two available retail licenses, the City declined to issue licenses to plaintiffs Quality Roots, Inc., and Exclusive Capital Partners LLC. Plaintiffs sued, alleging, *inter alia*, a violation of the OMA. The trial court found no violation of the OMA in the City's handling of the licensee-selection process, but the Court of Appeals reversed, applying this Court's decision in *Pinebrook Warren, LLC v City of Warren*[2] to hold that the city manager violated the OMA.[3] We disagree with both the Court of Appeals' holding and its application of *Pinebrook* to the facts of this case. We hold that the City's marijuana retail license selection process complied with the OMA. Accordingly, we reverse the decision of the Court of Appeals to the contrary and remand to the trial court for entry of summary disposition in favor of the City.

_____

[1] MCL 15.261 *et seq*.

[2] *Pinebrook Warren, LLC v City of Warren*, 515 Mich 438; 29 NW3d 403 (2024).

[3] *Exclusive Capital Partners LLC v Royal Oak*, ___ Mich App ___; ___ NW3d ___ (December 4, 2024) (Docket Nos. 366247 and 366257).

## I. FACTS AND PROCEDURAL HISTORY

### A. THE ROYAL OAK ORDINANCE

On July 27, 2020, the City adopted an ordinance regulating recreational marijuana establishments within its boundaries, pursuant to the Michigan Regulation and Taxation of Marihuana Act (MRTMA).[4] The ordinance sets forth a process by which license recipients are chosen. The ordinance grants the city manager "the power to fully and effectively implement and administer the municipal license application process."[5] If the City establishes a cap on the number of establishments, the ordinance requires the city manager to open a "window" during which applications can be submitted.[6] Applicants then submit applications to the City, which "City staff" reviews.[7] The ordinance next specifies the following:

> At the end of a window, if the number of applications for a marihuana establishment municipal license exceeds the number of available municipal licenses, the City shall decide among applications by a competitive process intended to select the applicant(s) who are best suited to operate in compliance with the Act within the City.[8]

The "competitive process" involves "the City Manager or his or her designee" ranking the applicants "in the order of which is best suited to operate in compliance with the Act within

---

[4] MCL 333.27951 *et seq*.

[5] Royal Oak Code, § 435-2(E).

[6] Royal Oak Code, § 435-4(C)(1).

[7] Royal Oak Code, § 435-4(B).

[8] Royal Oak Code, § 435-4(C)(2).

the City[.]"[9]  This ranking is "used to fill available municipal license slots, starting with the best-suited applicant and application, until all available municipal license slots are filled."[10]  The ordinance sets out the ranking criteria in § 435-4(C)(4)(a) to (j).

Under the ordinance, receiving a "municipal license slot" does not guarantee a license.  Rather, applicants must meet additional requirements to receive a license, including passing background checks and undergoing an engineering review.[11]  The ordinance also requires site plan approval.  An applicant for a municipal license slot must also establish that

> [a] special land use permit and site plan application has been submitted, permit fees have been paid, and the special land use permit and site plan has been approved by the City Commission after recommendation from the Planning Commission.[12]

The zoning section of the Royal Oak Code allows marijuana land use as a special land use, which requires site plan review and recommendation by the planning commission before a final decision by the city commission.[13]  Thus, if an applicant is selected to receive a license, the application is forwarded to the planning commission to consider the applicant's special-land-use permit and site plan and make a recommendation to the city commission

---

[9] Royal Oak Code, § 435-4(C)(4).

[10] *Id.*

[11] Royal Oak Code, § 435-4(D)(4).  An engineering review includes a preliminary review of the applicant's wastewater plan, as well as confirmation that the necessary amount of water is available for the establishment.  These and other similar requirements are intended to ensure that the establishment's utility services function properly prior to licensure.

[12] Royal Oak Code, § 435-4(D)(4)(f).

[13] Royal Oak Code, § 770-52.1(B).

for approval.[14]  If the city commission approves and all other conditions are met, the city clerk issues the license.[15]

## B.  THE RETAIL LICENSE SELECTION PROCESS

The July 2020 ordinance limited the number of marijuana retail licenses to two.[16] To fill those two spots, the city accepted license applications from December 2020 through February 2021.  City Manager Paul Brake received a total of 21 applications, including applications from plaintiffs Quality Roots and Exclusive Capital Partners.  To facilitate the ranking process, the city manager convened a "workgroup" composed of a number of city officials, including the city planner, city engineer, chief of police, and others.  The members of the workgroup provided the city manager with input relevant to their particular areas of expertise, based on their review of the applications.  The workgroup met four times and took no official notes.  In December 2021, the city manager eventually made the final selections, determining that intervening defendant PGSH Holdings LLC (known as "Gatsby") and Royal Oak Treatment LLC (Royal Treatment) were the best suited applicants under the ranking criteria.  The city manager notified plaintiffs that they would be placed in a "standby" category, which was essentially a waitlist in case the selected applicants failed a later stage of the licensing process.

---

[14] Royal Oak Code, § 435-4(D)(4)(f) and (5).

[15] Royal Oak Code, § 435-4(D)(7).

[16] Royal Oak Code, § 435-2(B)(5).

## C. LITIGATION

In February 2022, Quality Roots filed a complaint against the city, alleging due-process violations, OMA violations, and violations of the MRTMA's competitive-process and school-buffer requirements,[17] given that Gatsby was located less than 1,000 feet from a K-12 public school. A week later, the planning commission met and voted 3 to 2 to deny Gatsby's special-land-use permit, and 4 to 1 to recommend approval of Royal Treatment's special-use permit.

In March 2022, Exclusive Capital filed a complaint making claims similar to those in Quality Roots' complaint. The trial court consolidated these two cases. The City moved for summary disposition in both cases under MCR 2.116(C)(8) and (C)(10). While those motions for summary disposition were pending, the city commission overrode the planning commission's recommendation with regard to Gatsby, approving the special land use for both Gatsby and Royal Treatment. Both plaintiffs amended their complaints, and the City again moved for summary disposition. In separate hearings on December 14, 2022, the trial court granted the City's motions for summary disposition as to both cases. Both plaintiffs moved for reconsideration, and the court denied both motions. Quality Roots and Exclusive Capital both appealed by right.

The Court of Appeals consolidated the appeals, and on December 4, 2024, the Court of Appeals affirmed the trial court's orders granting summary disposition with respect to the MRTMA claims in a 25-page published opinion.[18] The Court of Appeals reversed,

---

[17] See Royal Oak Code, § 435-5(A)(5)(a)[1] (prohibiting marijuana establishments within 1,000 feet of a school).

[18] *Exclusive Capital Partners*, ___ Mich App at ___; slip op at 2.

however, on plaintiffs' OMA claims.[19]  Specifically, the Court of Appeals held that authority to decide among license applicants rested with the city commission and that the city manager only held authority to "implement and administer"[20] the application process for marijuana retail licenses.[21]  The Court of Appeals held that, in practice, however, the city manager had made the final decision, and the city commission did not conduct any meaningful review of the city manager's decisions.[22]  In light of this perceived delegation of authority, the panel concluded that the city manager met the definition of a "governing body" under the OMA and was therefore subject to the requirements of the OMA.[23]  Accordingly, the meetings between the city manager and the workgroup he appointed to help him select from the many applicants should have been held publicly.[24]  The Court of Appeals remanded the case to the trial court to determine the appropriate remedy for the OMA violations.[25]

The City moved for reconsideration, which the Court of Appeals denied.[26]  Quality Roots and the City both sought leave to appeal in this Court.  This Court denied Quality

---

[19] *Id*. at ___; slip op at 2.

[20] Royal Oak Code, § 435-2(E).

[21] *Exclusive Capital Partners*, ___ Mich App at ___; slip op at 23.

[22] *Id*. at ___; slip op at 23.

[23] *Id*. at ___; slip op at 23.

[24] *Id*. at ___; slip op at 23.

[25] *Id*. at ___; slip op at 25.

[26] *Exclusive Capital Partners LLC v Royal Oak*, unpublished order of the Court of Appeals, entered January 27, 2025 (Docket Nos. 366247 and 366257).

Roots' application[27] but ordered oral argument on the City's applications, directing the parties to address "whether the City of Royal Oak's city manager was a 'public body' as defined by MCL 15.262(a), subject to the Open Meetings Act, MCL 15.261 *et seq*."[28] After full briefing and oral argument, we now reverse.

## II. STANDARD OF REVIEW

"This Court reviews a motion for summary disposition de novo."[29] "In making this determination, the Court reviews the entire record to determine whether defendant was entitled to summary disposition."[30] "A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint."[31] "A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery."[32] "A motion under MCR 2.116(C)(10) . . . tests the *factual sufficiency* of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion," and the court may only grant the motion when there is

---

[27] *Quality Roots, Inc v Royal Oak*, ___ Mich ___; 26 NW3d 427 (2025).

[28] *Exclusive Capital Partners LLC v Royal Oak*, ___ Mich ___, ___; 26 NW3d 427, 428 (2025).

[29] *McCormick v Carrier*, 487 Mich 180, 188; 795 NW2d 517 (2010).

[30] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

[31] *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

[32] *Id*. at 160.

no genuine issue of material fact.[33]   This Court reviews any questions of statutory interpretation de novo.[34]

III.  THE OPEN MEETINGS ACT

This application for leave to appeal concerns the interpretation of the OMA.  "The purpose of the OMA is to provide openness and accountability in government."[35] Accordingly, the OMA requires, *inter alia*, "certain meetings of certain public bodies to be open to the public[.]"[36]  This case presents the question whether the OMA applies to Paul Brake, the Royal Oak city manager, his selection of applicants for marijuana retail licenses, and the informal review committee he convened to help him in the selection process. Relevant terms of the OMA are defined by the Legislature as follows:

> (a) "Public body" means any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function; a lessee of such a body performing an essential public purpose and function pursuant to the lease agreement; or the board of a nonprofit corporation formed by a city under section 4o of the home rule city act, 1909 PA 279, MCL 117.4o.

> (b) "Meeting" means the convening of a public body at which a quorum is present for the purpose of deliberating toward or rendering a decision on a public policy, or any meeting of the board of a nonprofit

[33] *Id*.

[34] *American Civil Liberties Union of Mich v Calhoun Co Sheriff's Office*, 509 Mich 1, 8; 983 NW2d 300 (2022).

[35] *Mich Open Carry, Inc v Mich House of Representatives*, ___ Mich App ___, ___; ___ NW3d ___ (April 8, 2025) (Docket No. 368942); slip op at 4.

[36] 1976 PA 267.

9

corporation formed by a city under section 4o of the home rule city act, 1909 PA 279, MCL 117.4o.

(c) "Closed session" means a meeting or part of a meeting of a public body that is closed to the public.

(d) "Decision" means a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy.[37]

A governmental entity can qualify as a "public body" by one of two pathways: "Either (1) the entity satisfies the statutory definition of 'public body' in its own right or (2) the entity is delegated authority from another public body."[38]

With regard to the first pathway, we have explained that "to be a public body, the entity at issue must be a state or local legislature or governing body, including a board, commission, subcommittee, authority, or council."[39] In *Pinebrook*, we affirmed a rearticulation of the definition of "governing body" as "a body that regulates or controls a political subdivision, that is self-governing and independent, and that makes decisions through which it effectuates or formulates public policy for a political subdivision."[40] To be "self-governing and independent," the body does not have to "exercise supreme or unchecked power, i.e., it need not be the main governing body" of a political subdivision.[41]

---

[37] MCL 15.262.

[38] *Pinebrook*, 515 Mich at 456.

[39] *Id*. at 457 (quotation marks and citations omitted).

[40] *Id*. at 457, citing *Davis v Detroit Fin Review Team*, 296 Mich App 568, 593-600; 821 NW2d 896 (2012).

[41] *Pinebrook*, 515 Mich at 457.

Further, the body must exercise independent authority and not "merely advis[e] others how to effectuate or formulate public policy for a political subdivision."[42] Generally, individual government officials are not "public bodies" within the meaning of the statute.[43] The Court first announced this principle in *Herald Co v Bay City*. In that case, the Bay City Charter specified that the Bay City Commission was to appoint a new fire chief on the recommendation of the city manager.[44] The city manager formed a five-person committee to assist him in making his recommendation.[45] The city manager ultimately selected and recommended the final candidate from a group of three that the committee had chosen.[46] This Court concluded that the city manager was not a public body.[47] Noting that "the term 'public body' connotes a collective entity,"[48] the Court held that "an individual executive acting in his executive capacity is not a public body for the purposes of the OMA."[49]

The second pathway under which an entity can qualify as a public body comes from the delegation of authority. This Court first addressed the delegation pathway in *Booth*

---

[42] *Id*. at 457-458.

[43] *Herald Co v Bay City*, 463 Mich 111, 131; 614 NW2d 873 (2000).

[44] *Id*. at 115.

[45] *Id*.

[46] *Id*. at 115-116.

[47] *Id*. at 131.

[48] *Id*. at 129 (emphasis omitted).

[49] *Id*. at 131.

*Newspapers, Inc v Univ of Mich Bd of Regents*.[50]  In that case, the eight-member Board of Regents of the University of Michigan appointed itself as the Presidential Selection Committee to select a new president for the University.  The Board also appointed one of the regents as chairman of the Selection Committee and formed advisory committees to assist the Selection Committee.  In response to a challenge under the OMA, this Court held that the Board of Regents was unquestionably a public body and that the selection of the president was one of its most important governmental functions.[51]  If a public body delegates its authority to "any form of subcommittee and empowers that subcommittee by 'resolution or rule' to exercise this particular governmental authority, then that subcommittee is also a 'public body' within the meaning of the act."[52]  This also applies when a public body delegates its authority to individuals: "whether a multi-member panel or a single person presides [is not] dispositive."[53]

In our decision in *Pinebrook*, this Court further refined the contours of the pathways to becoming a public body.  In *Pinebrook*, the city of Warren had established a limit on the number of medical marijuana dispensary licenses available in the city,[54] in accordance with the Michigan Medical Marihuana Act.[55]  The city of Warren created a

---

[50] *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211; 507 NW2d 422 (1993).

[51] *Id*. at 225.

[52] *Id*.

[53] *Id*. at 226 (quotation marks and citation omitted).

[54] *Pinebrook*, 515 Mich at 447.

[55] MCL 333.26421 *et seq*.

"Review Committee" to review applications for dispensaries.[56] The Review Committee was to score the applicants on their compliance with relevant criteria and then forward the scores and applications to the city council with its recommendations.[57] The city council was responsible for ranking the applicants and for final approval of license applications.[58]

In *Pinebrook*, we noted that an assessment under the OMA requires us to "examine both the language of the enabling action . . . and the actions actually taken by the new entity."[59] We disagreed "that a determination of whether the OMA covers an entity is just confined to the words of that subgroup's enabling ordinance."[60] Warren's marijuana ordinance gave the city council final decision-making authority, but in practice, the Review Committee effectively decided who would receive a license. We noted that "the city council voted to approve the applicants most highly ranked by the Review Committee without any independent consideration of the merits of the applications."[61] We found it significant that the Review Committee was the "de facto selector of who would receive a

---

[56] *Pinebrook*, 515 Mich at 448.

[57] *Id*. at 448-449.

[58] *Id*. at 449.

[59] *Id*. at 464.

[60] *Id*. at 463.

[61] *Id*. at 464.

marijuana license," and, therefore, functioned as a "governing body."[62]  Accordingly, we concluded that the Review Committee was a " 'public body' " subject to the OMA.[63]

## IV.  ANALYSIS

## A.  FIRST PATHWAY

The first step in applying the OMA to the present case is to determine whether the city manager qualifies as a "public body" as defined in that act.  Pursuant to our decision in *Herald*, the city manager does not himself qualify as a "public body" in his "own right."[64]  As observed in *Herald*, the OMA does not allow for the possibility that individuals can qualify as public bodies on their own:

> As used in the OMA, the term "public *body*" connotes a collective entity.  The statutory terms used illustratively to define "public body"— "legislative body" and "governing body"—do not encompass individuals.  A single individual is not commonly understood to be akin to a "board," "commission," "committee," "subcommittee," "authority," or "council"— the bodies specifically listed in the act by the Legislature.  We draw additional comfort in our construction of the OMA because the Legislature is certainly free to define, and has, in fact, defined elsewhere, the term "public body" in such a way as to encompass individuals.  However, it would be awkward, to say the least, to apply the OMA to an individual.  Perhaps the strongest common-sense basis for concluding that an individual was not

---

[62] *Id.*

[63] *Id.* at 464, 470.  Our *Pinebrook* decision fits under either pathway to OMA obligations. This Court held "that the Marijuana Ordinance empowered the Review Committee to exercise a governmental function by scoring applications.  Moreover, the Review Committee became a governing body when it effectively decided who would receive a license." *Id.* at 464.  Therefore, the first pathway applied because "the Review Committee was the de facto selector of who would receive a marijuana license." *Id.*  But we also reasoned that the second pathway applied because, "[l]ike in *Booth*, . . . the city council delegated its job as a 'public body' to the Review Committee . . . ." *Id.* at 469.

[64] *Id.* at 456.

contemplated by the Legislature as a "public body" is to consider how odd a concept it would be to require an individual to "deliberate" in an open meeting. MCL 15.263(3).[65]

In the present case, the city manager, Brake, is an individual. He is not a "board," "commission," "committee," "subcommittee," "authority," or "council" for purposes of MCL 15.262. As we discuss below, an individual may qualify as a "public body" under the second pathway by way of delegation. Without such delegation, however, *Herald* dictates that an individual cannot be a "public body" in his or her own right.[66]

### B. SECOND PATHWAY

### 1. THE COURT OF APPEALS OPINION

Under the second pathway, an entity can qualify as a "public body" for purposes of the OMA if an entity that meets the statutory definition of a public body delegates its authority to the subject entity. The Court of Appeals applied this pathway to the facts of

---

[65] *Herald*, 463 Mich at 129-131. We noted that the city commission in *Herald* did not delegate authority to the city manager; rather, the city's charter directly authorized the city manager to make a recommendation, and the charter required the city commission to act on the city manager's recommendation. *Id*. at 132.

[66] This conclusion is in line with *Davis*, 296 Mich App 568, which we cited approvingly in *Pinebrook*. *Davis* involved the State Treasurer and an accompanying financial review team that was appointed by the Governor under the Local Government and School District Fiscal Accountability Act (commonly known as the "emergency financial manager act"), MCL 141.1501 *et seq*., to review the finances of the City of Detroit. *Davis*, 296 Mich App at 577. The team was to meet with city officials and receive information on the financial condition of the city. As relevant to this case, the *Davis* Court held that the State Treasurer, who participated in the process according to his statutory duties, was not a "public body" because he was acting in his executive capacity under the emergency financial manager act. *Davis*, 296 Mich App at 586-588; see also *Pinebrook*, 515 Mich at 461.

15

the present case to conclude that the city manager qualified as a public body under the OMA. We disagree with this conclusion.

The Court of Appeals' central error was presuming that the city commission held original authority under the ordinance to decide among license applicants. The Court of Appeals stated that the relevant "authority rested with the City Commission, 'the public body.' "[67] The Court of Appeals noted that, "[o]n paper, the marijuana ordinance did not grant the city manager authority to make the final decision on awarding retail licenses."[68] Instead, "the ordinance indicated that the 'City shall decide among Applications' which were best suited to operate in compliance with the MRTMA[.]"[69] Applicants that make it past the ranking process do not automatically receive a license. Rather, "an applicant obtains the license only after the City Commission approves the applicant's special-land-use permit and site plan, and, if other requirements are met, the City Clerk issues the license."[70] The Court of Appeals went on to conclude that, in practice, the city manager was the de facto decision-maker in the process: "whichever applicants made it through the city manager's process received licenses."[71] Under the *Pinebrook* framework, an entity operating under de facto or delegated authority from a public body itself qualifies as a public body. The Court of Appeals thus concluded that since the city manager in the

---

[67] *Exclusive Capital Partners*, ___ Mich App at ___; slip op at 21.

[68] *Id*. at ___; slip op at 23.

[69] *Id*. at ___; slip op 23.

[70] *Id*. at ___; slip op 23.

[71] *Id*. at ___; slip op 23.

16

present case was exercising the authority of the city commission in determining which applicants received licenses, and since the city commission effectively conducted no independent review, the city manager was a "public body" under the *Pinebrook* and *Booth* precedents.[72]

The Court of Appeals erred, not in its interpretation of *Pinebrook*, but in its initial conclusion that the ordinance awarded decision-making authority to the city commission.[73] Rather, the ordinance gives the city manager the power to decide among applicants. The city ordinance states that "[t]he City Manager is granted the power to fully and effectively implement and administer the municipal license application process."[74] The ordinance further states, "The applicants and their applications will be ranked in the order of which is best suited to operate in compliance with the Act within the City as determined by the City Manager[.]"[75] Lastly, the ordinance specifies, "This ranking will be used to fill available municipal license slots, starting with the best-suited applicant and application, until all available municipal license slots are filled."[76]

---

[72] *Id*. at ___; slip op 23.

[73] The pertinent sections of the MRTMA empower a "municipality" to decide whether and how they want to permit marijuana businesses in their communities but do not specify who within the municipality must exercise that authority. See, e.g., MCL 333.27959(4); MCL 333.27956(2). Plaintiffs do not argue that the MRTMA precluded the enactment of an ordinance that authorized the city manager—rather than the city commission—to rank the suitability of applicants under MCL 333.27979(4).

[74] Royal Oak Code, § 435-2(E).

[75] Royal Oak Code, § 435-4(C)(4).

[76] *Id*.

We interpret these provisions as indicating that the city manager is the entity that conducts the ranking process that leads to the top-ranked applicants receiving a license slot—the city commission has no role in the ranking process. The ordinance does not specify any intervening step between the ranking process and the "fill[ing of] available municipal license slots[.]"[77] Whomever the city manager ranks in the top positions receives any available "license slot." To put it differently, the receipt of an available municipal license slot is complete once the city manager has finished the ranking.

To be sure, receiving a license slot does not guarantee a license. Applicants must complete several additional steps in order to receive a license, including paying a fee, passing a background check, and receiving approval from various municipal departments, such as the Engineering Division and the Community Development Department.[78] Additionally, the applicant must receive final approval for its special-land-use permit and site plan from the city commission after recommendation from the planning commission.[79] But none of these additional steps required to receive a license involve the exercise of discretion to choose *among applicants* according to the competitive criteria. Rather, each of these steps involves tangential considerations. The only entity responsible for ranking the applicants is the city manager, and once he or she completes that duty, the top-ranked applicants receive "license slots." Accordingly, we conclude that the ordinance empowers the city manager, not the city commission, to select among applicants.

---

[77] *Id*.

[78] Royal Oak Code, § 435-4(D)(4).

[79] Royal Oak Code, § 435-4(D)(4)(f).

18

Thus, the proper consideration is whether the city manager, acting in the authority granted to him by ordinance, violated the OMA. In accordance with *Herald* and our other precedents, as addressed above, we conclude that he was not subject to the OMA.

Plaintiffs and the Court of Appeals place great weight on the fact that the ordinance states that "the City shall decide among applications . . . ."[80] It is true that the city charter gives the city commission "full power and authority . . . to exercise all the powers conferred upon the City."[81] However, we are not convinced that the phrase "The City"— which is not defined in the ordinance[82]—necessarily refers to the city commission. The city's charter specifies that the form of government in the City is a "Commission-Manager form."[83] We see no reason why the ordinance's specification of "[t]he City" cannot apply with equal merit to the city manager as to the city commission.

In addition, the language of the marijuana ordinance persuades us that the ordinance identifies the city manager, not the city commission, when it uses the phrase "the City." The marijuana ordinance states, "The City Manager is granted the power to fully and effectively implement and administer the municipal license application process."[84] The ordinance also empowers the city manager to rank the applicants according to competitive criteria and states that the top-ranked applicants will be awarded "municipal license

---

[80] Royal Oak Code, § 435-4(C)(2).

[81] Royal Oak Charter, ch 3, § 1.

[82] See Royal Oak Code, § 435-1 ("Definitions").

[83] Royal Oak Charter, ch 3, § 1.

[84] Royal Oak Code, § 435-2(E).

19

slots."[85]  The ordinance does not mention any intervening or ensuing approval by the city commission, except for the site plan approval.  Nor does the ordinance ever use the language of recommendation to describe the city manager's function.  This context is sufficient evidence for us to conclude that the ordinance means the city manager when it provides that "the City shall decide among applications . . . ."[86]

In sum, the city commission has no role in selecting among applicants other than to approve or disapprove site plans.  Thus, the Court of Appeals erred by concluding that the city commission delegated its authority under the marijuana ordinance to the city manager, thereby rendering him a "public body."  Instead, the city manager was "acting alone in [his] official work capacity pursuant to an independent grant of authority,"[87] and, therefore, was not subject to the OMA.

## 2.  PLAINTIFFS' ARGUMENTS

In the alternative, plaintiffs argue that the ordinance itself constitutes a delegation of the city commission's general licensing authority given to it in the city charter.  In other words, plaintiffs argue that even if the Court of Appeals was wrong, the *city charter* gave the city commission licensing authority that the commission formally gave to the city manager by way of ordinance.  The Court of Appeals, by contrast, assumed that the *ordinance* gave the licensing authority to the city commission, and the city commission

---

[85] Royal Oak Code, § 435-4(C)(4).

[86] Royal Oak Code, § 435-4(C)(2).

[87] *Pinebrook*, 515 Mich at 461.

20

then informally delegated the authority to the city manager by adopting his recommendation without any further consideration.

To support their argument, plaintiffs note that the Royal Oak charter vests the city commission with "full power and authority . . . to exercise all the powers conferred upon the City."[88] The city commission is "the legislative and governing body of the City[.]"[89] The city charter also grants the city (and therefore the city commission) the "power and authority to pass such ordinances and adopt such resolutions as they shall deem proper in order to exercise any or all of these powers possessed by [the] City."[90] This includes the power to "regulate, license, and control hotels, rooming houses, boarding houses, restaurants, candy and soft drinks manufacturers and distributors, either wholesale or retail, and other business and occupations[.]"[91] In combination, plaintiffs contend that these provisions demonstrate that the city commission, as the entity with authority to exercise all the powers conferred upon the city, is the entity with the authority to issue licenses. Because the city commission is a public body under the OMA, any delegation of its authority by ordinance subjects the delegee to the same OMA requirements as the city commission.

Although plaintiffs focus on the facts of this case, the thrust of their position is that whenever a charter-empowered legislative public body delegates any of its authority by

---

[88] Royal Oak Charter, ch 3, § 1.

[89] Royal Oak Charter, § 2.

[90] *Id*.

[91] Royal Oak Charter, ch 2, § 1.

way of ordinance to another entity, that entity is automatically subject to the OMA. We disagree with this overly broad conceptualization of the delegation pathway.

As with any question of statutory interpretation, "[w]e begin by construing the language of the statute itself."[92] The OMA specifies, in relevant part, that a "public body" is a "legislative or governing body . . . that is empowered by state constitution, statute, charter, *ordinance*, resolution, or rule[.]"[93] Thus, the OMA contemplates that some entities empowered by ordinance will be subject to the OMA.[94] However, plaintiffs' argument asks us to hold that *every* ordinance-based delegation of authority by a charter-empowered legislative public body with generalized authority—delegated to *any* entity—automatically constitutes a delegation of authority subject to the OMA. The text of the OMA does not support this conclusion. Some ordinance-empowered entities do not qualify as "public bodies." For example, as we noted in *Herald*, "an individual was not contemplated by the Legislature as a 'public body' "[95] because "the term 'public *body*' connotes a collective entity."[96] Thus, the OMA accommodates at least some entities "empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or

---

[92] *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 202; 731 NW2d 41 (2007). See also *Potter v McLeary*, 484 Mich 397, 410; 774 NW2d 1 (2009) ("In determining the intent of the Legislature, this Court must first look to the language of the statute.").

[93] MCL 15.262(a) (emphasis added).

[94] See *Pinebrook*, 515 Mich at 467-468 (recognizing that an ordinance can provide authority that renders an entity a public body that must comply with the OMA).

[95] *Herald*, 463 Mich at 131.

[96] *Id*. at 129.

proprietary authority"[97] that still do not meet the definition of a "public body." Plaintiffs' position conflicts with our prior holdings to this effect.

Additionally, if we were to adopt plaintiffs' interpretation, the resulting imposition of the OMA would be expansive. The ordinary meaning of the term "ordinance" is "a municipal regulation."[98] Particularly when contrasted with the other words in the OMA's list of empowering instruments, "ordinance" stands out as a distinctly local kind of regulation. Further, most—if not all—municipal governments are empowered by charter.[99] Taken together, these observations support the proposition that the vast majority of ordinances are enacted by the general-power governing bodies of charter municipalities. This means that under plaintiffs' interpretation, arguably every ordinance-based grant of governmental or proprietary authority[100] would import the requirements of the OMA.[101] We decline to interpret the OMA this broadly.

---

[97] MCL 15.262(a).

[98] *Merriam-Webster's Collegiate Dictionary* (11th ed) ("[A] law set forth by a governmental authority; [specifically,] a municipal regulation[.]").

[99] See *Hackel v Macomb Co Bd of Comm'rs*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 166363); slip op at 11 ("Michigan is a home rule state, in which local governments are vested with general constitutional authority to act on all matters of local concern not forbidden by state law.") (quotation marks and citation omitted); *Gallup v City of Saginaw*, 170 Mich 195, 201; 135 NW 1060 (1912) ("We are unable to conceive of a valid municipal corporation without a charter, or a municipal charter without a corporation[.]").

[100] See MCL 15.262(a) (" 'Public body' means any state or local legislative or governing body . . . that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . .").

[101] As amici Michigan Municipal League and the Government Law Section of the State Bar of Michigan point out, "individual administrators such as city managers are tasked

Our holding in this case is consistent with our caselaw and provides added guidance on how to distinguish between OMA-subject and OMA-exempt delegations of authority by ordinance. In *Booth* and subsequent caselaw interpreting that decision, we have suggested three bases for our holding that the Board of Regents had delegated its authority in a manner subject to the OMA. First, we noted that "[t]he selection of a university president is one of the board's most important exercises of governmental authority."[102] In other words, when a public body delegates to another entity an important function that it is tasked by law to do, it becomes more likely that such a delegation carries with it the requirements of the OMA. Second, we noted that the Board's actions evinced an intent to avoid the requirements of the OMA. For example, the Board took great pains to communicate between individual members and subquorum groups to avoid the OMA's obligations for full-board meetings. This had the intended effect of retaining authority in some of its members to make the decision at issue but shielding from public view the entire hiring process other than the final vote on the one remaining candidate.[103] This suggests that when the primary purpose of a public body's action is to evade the requirements of the OMA, it becomes more likely that any resulting delegation carries with it the requirements

with executing legislative directives. Many of those directives are set forth in local ordinances . . . ." Amici note the impracticality of requiring an administrator to, for example, give notice and hold a public hearing for the process of managing a budget. As another example, the city points out that the city commission has enacted an ordinance, Royal Oak Code, §195-11, that empowers the city clerk to issue dog licenses. Arguably, pursuant to plaintiffs' broad theory of delegation, this is also a delegation of the city commission's power and thus subject to the OMA.

[102] *Booth Newspapers*, 444 Mich at 225.

[103] *Id*. at 228-229.

of the OMA. Finally, we have found it significant that the Board of Regents in *Booth* provided authority to an individual member *of that same public body*, and we have contrasted that with a situation in which authority is provided to an individual executive official that is not a member of a public body.[104] While the former may require OMA compliance under a delegation theory, the latter generally will not.

None of these factors is present in the instant case. The city charter awards numerous powers to the City.[105] The list is long and essentially all-encompassing. The Royal Oak Code then gives the city commission general authority to exercise all of those powers. But neither the city charter nor the MRTMA *requires* that the city commission rank and select marijuana retail establishment applications for licensure. Thus, we cannot conclude that this function is "one of the [commission's] most important exercises of governmental authority."[106] Additionally, nothing in the record before us suggests that the primary purpose of the ordinance was that the city commission evade the OMA by giving decision-making authority to the city manager. On the contrary, the allocation of authority in the marijuana ordinance strikes us as a common and unremarkable sharing of authority

---

[104] See *Herald*, 463 Mich at 135 n 18 ("We do not quarrel with the conclusion in *Booth* that an individual member of a public body may, under certain circumstances, qualify as a 'public body.' The distinguishing factor is that, in *Booth*, there existed a public body in the first instance—the Board of Regents—that impermissibly attempted to delegate its authority as a *body* to subunits of its *individual* members."); *Pinebrook*, 515 Mich at 461 ("The Court of Appeals explained the difference in *Davis*, noting that the *individual member* of the public body (*Booth*) is distinguishable from an *individual executive* (*Herald*).").

[105] Royal Oak Charter, ch 2, § 1.

[106] *Pinebrook*, 515 Mich at 459 (quotation marks and citation omitted).

in a Commission-Manager form of local government. Finally, the city manager is not a member of the city commission but, rather, is a charter-authorized administrative official that is separate from the city commission.[107] Accordingly, *Booth* is distinguishable from the present case.

We do not hold that delegation by ordinance can *never* qualify as an OMA-subject delegation under the second pathway. Rather, according to *Booth*, courts analyze an empowering ordinance in the context of the OMA by asking whether the primary government entity has delegated any functions that it is required by law to do, whether the primary government entity's actions have the primary purpose of permitting that entity to evade the requirements of the OMA, and whether the public body has provided authority to a subquorum of its own members. Additionally, our decision today leaves our holding in *Pinebrook* undisturbed: when applying the pathways to OMA obligations, a court will consider how the relevant public body functions and will not confine its analysis to the public body's enabling provisions. And finally, courts will still conduct an analysis under the first pathway, asking whether the delegate entity itself qualifies as a "public body" under the OMA. In the present case, the city manager is not a public body in his own right and is not a public body by way of ordinance-based delegation.

## V. CONCLUSION

In sum, we hold that the city manager in the present case acted according to ordinance-based authority when ranking marijuana retail license applicants to receive license slots. By ordinance, the city commission's only role in the marijuana retail license

___

[107] See Royal Oak Charter, ch 3, § 16.

26

selection process is to give final site plan approval.  In addition, the marijuana ordinance does not itself qualify as a delegation of authority subject to the OMA.  The city manager was therefore not required to comply with the OMA in conducting the marijuana retail license selection process.  Accordingly, we reverse Part VI of the judgment of the Court of Appeals and remand to the trial court for entry of summary disposition in favor of defendant.

Brian K. Zahra
Megan K. Cavanagh
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

HOOD, J., did not participate because he was on the Court of Appeals panel that issued the decision under review.

27